## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEROY WILLIAMS, | |
| *Plaintiff,* | CIVIL ACTION |
| v. | NO. 22-3313 |
| SCHOOL DISTRICT OF PHILADELHIA, | |
| *Defendant.* | |

**PAPPERT, J.**                                                     **May 12, 2023**

### <u>MEMORANDUM</u>

Leroy Williams has long worked as a counselor for the School District of Philadelphia.  In December of 2020, one of his female colleagues, Jennifer Barbo, accused Williams of sexually harassing her.  Williams is black; Barbo white.  Pursuant to a process that had been in place for at least four years, the District required Williams to report each day to a designated "reassignment room" while it investigated the allegations against him.  The use of the reassignment room while an employee is under investigation for sexual harassment was agreed to between the District and the Philadelphia Federation of Teachers.  Taking out the periods of time during the Covid-19 pandemic where Williams worked virtually from home, he reported in person to the reassignment room for roughly six months.

While under investigation, Williams received full pay and benefits.  He was never suspended, his title never changed and he retained his seniority with the District. The conditions of his employment and his daily responsibilities were altered; Williams contends he did "nothing" except sit around all day on a "hard chair" in a dirty, poorly

1

ventilated, windowless room.  At the conclusion of a lengthy, "multi-level" investigation, the District found that Williams engaged in conduct that was inappropriate and offensive, but did not rise to the level of unlawful discrimination or harassment on the basis of sex.  Williams received only a written warning that, pursuant to the Collective Bargaining Agreement between the District and teachers' union, was placed in his personnel file for eighteen months.  He returned to his regular duty station.

Williams subsequently filed this lawsuit against the District asserting claims of racial and gender discrimination and retaliation under Title VII and racial discrimination and retaliation under 42 U.S.C. § 1981.  The District moved for summary judgment on all claims.  Williams did not contest the motion with respect to the retaliation or § 1981 claims and at oral argument agreed that the Court should enter judgment in the District's favor on both of them.  (Hr'g Tr. 2:25—3:19.)

After reviewing the parties' submissions and holding oral argument, the Court grants the motion with respect to the remaining claims and enters judgment for the District.  Williams did not suffer an adverse employment action.  While his reassignment was for a longer period of time than Williams cared to endure, it was still temporary and lacked the hallmarks of a "serious and tangible" action.  Even if the reassignment could constitute an adverse employment action, nothing in the record presents a jury question as to whether Williams's race or gender played any role in the District's decision to follow the established and agreed upon practice of reassigning an employee pending an investigation of alleged misconduct.  The only record evidence Williams points to under his preferred "cat's paw" theory is that he was alleged to have called his accuser "thick for a white girl," something he denies saying.  But that alleged

2

comment, whether Williams denied making it or not, does not allow a jury to infer that Barbo's allegations give rise to an inference of intentional discrimination or that the reassignment was pretext for illegal discrimination.

I

A

Williams concedes the entirety of the Defendant's statement of facts; none of the following is in dispute.  (Hr'g Tr. 36:25–37:10.)  Barbo accused Williams of sexually harassing her on November 30, 2020 in a December 1 complaint she filed with the District's Office of Employee and Labor Relations. (Ex. 4.)  Barbo and Williams were both counselors at Furness High School; Williams was the lead counselor and Barbo worked with him.  (Ex. 1 7:17–21; Ex. 10 at Request 10.)  Barbo's complaint alleged Williams made various comments to her at work, including "[d]epressed?! But you're too fine to be depressed;" "[y]ou're thick for a white girl;" and "[t]he boys must love you." (Ex. 4.)

After receiving Barbo's complaint, the Office of Employee and Labor Relations conducted a brief investigation to determine whether the allegations required Williams's reassignment pending their formal review.  (Ex. 8 ¶¶12–14.)  Traci Gardner, a District labor relations officer, interviewed Barbo on December 3, 2020.  (Ex. 13.) Based on this interview and the nature of the allegations, Ronak Chokshi, Interim Deputy of the ELR office, temporarily removed Williams from Furness and assigned him to the District's reassignment room on December 11.  (Ex. 8 ¶ 12.)  Mr. Chokshi notified Williams of his reassignment by letter, writing:

> [Y]ou are to be removed from your regular assignment pursuant to outcome of an investigation and disciplinary

3

> process.  Therefore, pending completion of the disciplinary process, you are temporarily reassigned to The Education Center at 440 North Broad Street.  You are to report to room 3068A, 3rd floor, Portal A.  Due to the COVID-19 pandemic, you are not required to physically report to The Education Center at this time.

(Ex. 11.)  Williams reported to the reassignment room virtually from December 11 through the end of the school year, and in person from the start of the 2021–2022 school year until February 22, 2022, when the investigation was complete.  (Ex. 11; Ex. 1 36:3–11; Ex. 26.)

The District has utilized the "reassignment room" as a temporary assignment for employees accused of misconduct posing a risk to students or staff since at least 2016.  (Ex. 8 ¶ 6.)  Employees assigned to the room remain there while allegations against them are investigated.  If the allegations are deemed unfounded or otherwise not supported, employees are returned to their appointed or permanent assignments; if the reports have merit, disciplinary action is taken.  (Ex. 8 ¶ 7.)

In the case of a sexual harassment allegation, it is standard for the District to remove and reassign an alleged perpetrator.  (Ex. 9 34:11–20.)  Use of the reassignment room is an agreed upon practice between the teachers' union and the District, and the process is specifically outlined in their Collective Bargaining Agreement.  (Ex. 8 ¶¶ 8–9; Ex. 9 35:4–8.)

B

Williams claims that his time in the reassignment room constitutes an adverse employment action because Barbo filed her report out of racial and gender animus and the reassignment itself substantially changed his duties.  (Resp. Opp. 8.)  When asked to describe the basis for his belief Barbo was "racially-motivated," Williams stated:

4

> I as a black male was targeted by a white female who ran out of options and was desperate. The allegations against me accused me of referring to Ms. Barbo's race as well. She had made various attempts to move me out of my position at Furness as lead counselor, and she was plagued by years of mental health issues. When the minor attempts to avoid the focus on her lack of work ethic failed, she moved to playing a race card that often has proved to be favorable in history against African American males—accusing a black male of sexual harassment and/or inappropriate behavior. This diverted attention from her incompetencies [sic] and her failures at work. The timing of the "me too movement" was of significance at the time of her accusation. My determination of this being racially motivated is also based on the fact that I never said anything appropriate or sexual in any way, shape or form.

(Ex. 10 at Request 10.)[1] Williams also claims that the School District accepted Barbo's story as true because "she is Caucasian and [he is] not." (Ex. 27.)

While reassigned, Williams received his full rate of pay, was not suspended, and retained his seniority. (Ex. 1 35:10–14, 67:6–10.) He also received his lunch and prep period each day. (Ex. 1 40:8–9, Ex. 9 41:16–19.) Williams conceded that his race and sex did not factor into Mr. Chokshi's decision to temporarily reassign him; rather, he admits that the decision was based strictly on Chokshi's determination that allegations had been made against him that implicated the safety and/or well-being of another member of the Furness staff. (Ex. 8 ¶ 14.)

---

[1]     Williams's speculation as to why Barbo would target him is not sufficient. *See Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). In any event, at oral argument counsel acknowledged that his client's subjective belief is not relevant and that he relies only on the fact that Williams denied making the comment attributed to him. (Hr'g Tr. 38:15–39:10.)

II

A

Summary judgment is warranted if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145 (3d Cir. 2004), *holding modified by Erdman v. Nationwide Ins. Co.*, 582 F.3d 500 (3d Cir. 2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the suit under the governing law. *Id.* A mere scintilla of evidence supporting the nonmoving party will not suffice for a court to deny summary judgment. *Id.* at 252. Rather, the nonmovant must "set forth specific facts showing there is a genuine issue for trial." *Id.* at 256. A court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009). But it need not credit "[u]nsupported assertions, conclusory allegations, or mere suspicions." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). Nor may a court make credibility determinations or weigh the evidence. *See Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016).

III

A

Discrimination claims based on circumstantial evidence are analyzed under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793 (1973). Under this framework, a plaintiff must first establish a *prima facie* case of discrimination. This requires showing that the plaintiff (1) "is a member of a protected class;" (2) is "qualified for the position" he seeks to retain; (3) "suffered an adverse employment action;" and (4) "the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008). "The burden of establishing a *prima facie* case of disparate treatment is not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981).

The District concedes that Williams is a member of a protected class and qualified for the position at issue—so the Court is left to decide whether he has established that he suffered an adverse employment action under circumstances that support an inference of discrimination. (Hr'g Tr. 11:12–22.)

Williams argues that his requirement to "physically report to the 'reassignment room' (also referred to as the 'rubber room')" was an adverse employment action. (Resp. Opp. 6). An adverse employment action in the discrimination context is an action "serious and tangible enough to alter an employee's compensation, terms, conditions or privileges of employment," including "firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Jones v. SEPTA*, 796 F.3d 323, 326 (3d Cir. 2015); *Remp v. Alcon Labs., Inc.*, 701 F. App'x 103, 106–107 (3d Cir. 2017).

7

Williams contends, and the District concedes, that his duties changed upon his reassignment.  (Hr'g Tr. 22:12–14, 7:6–13.)  He further alleges that the condition of the room—that it was "windowless, often dirty, and poorly ventilated" contributed to the reassignment's impact on him.  (Resp. Opp. 6–7.)  He relies on *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742 (1998) to support this proposition, citing language that an adverse employment action is a "significant change in employment status such as…reassignment."  (Resp. Opp. 6) (citing *Burlington*, 524 U.S. at 761).

But Williams's alleged adverse employment action was temporary.  He suffered no permanent change to his employment status; he was not fired, demoted, suspended, docked pay, or permanently transferred.  The only discipline he did receive, a note in his file, was to be removed after eighteen months.  (Ex. 2 at D000223.)  The actions taken against Williams were temporary, standard, and pursuant to a procedure established in his employment contract and specifically bargained for by his union.  (Ex. 1 8:20–24; Ex. 8 ¶¶ 8–9.)

Other courts in this Circuit have found that a temporary reassignment, without any other change to employment status, does not constitute an adverse employment action under Title VII—in either the discrimination or retaliation context.  *See Young v. St. James Mgmt., LLC*, 749 F. Supp. 2d 281, 298 (E.D. Pa. 2010) (where a maintenance man's reassignment to "housekeeping duties" was not permanent and did not reduce his wage);  *Ferguson v. E.I. duPont de Nemours & Co.*, 560 F. Supp. 1172, 1202 (D. Del. 1983) (in the retaliation context, where a secretary's transfer from a fixed position to the secretarial pool was temporary and pay and benefits remained the same).

8

Williams knew his reassignment was temporary. *See* (Ex. 11). Although his responsibilities and duties *did* change during his reassignment—he was not counseling students—they were not permanently altered. (Hr'g Tr. 7:2–12.)[2] Because the process by which he was reassigned was clearly established, temporary and without any other change to his employment status, his reassignment was not so "serious and tangible" to constitute an adverse employment action.

Even if the temporary reassignment could constitute an adverse employment action, Williams cannot establish that the circumstances of that reassignment support an inference of discrimination. Whether analyzed as a traditional discrimination claim or, as Williams requests, through the lens of the "cat's paw" theory, there is no evidence in the record that would allow a reasonable juror to conclude that the District reassigned Williams because of his race or gender. Williams conceded that Chokshi's decision to reassign him was devoid of any racial or gender bias, and for the reasons discussed in Section III.B, *infra*, there is no evidence in the record to support Williams's theory that Barbo was motivated to file her complaint because of gender or racial animus.

While the bar for proving a *prima facie* case is "not onerous," Williams has not met it here. *Tex. Dep't of Cmty. Affairs,* 450 U.S. at 253. Because Williams's removal was temporary and no evidence could support an inference of discrimination, Williams has failed to show a *prima facie* case of discrimination.

---

[2]     District officials testified that the disciplinary process can take a long time for a variety of reasons and the length of Williams's process was not unique. (Ex. 9 43:11–23, 44:11–14.)

B

*McDonnell Douglas* presents a burden shifting framework.  The plaintiff "has the ultimate burden of persuasion at all times," *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017), but once he establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse action.  *McDonnell Douglas*, 411 U.S. at 802.  If the defendant does so, the burden then shifts back to the plaintiff to prove that the defendant's nondiscriminatory reasons were pretextual and the real reason for the adverse action was illegal discrimination.  *Burton v. Teleflex, Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).

Even if Williams could make out his *prima facie* case, the District had a legitimate, nondiscriminatory reason for the reassignment: it is standard practice when investigating complaints of sexual harassment.  There is no record evidence that the reassignment was pretext for illegal or invidious discrimination.

Williams concedes that the District did not demonstrate discriminatory animus in its decision to assign him to the reassignment room.[3]  (Ex. 8 ¶ 14.)  He instead proceeds under the cat's paw theory of discrimination where employers are liable when an employee performs an act, motivated by animus, to cause an adverse employment action and that act is a proximate cause of the action.  (Resp. Opp. 1); *Jones*, 796 F.3d at 330 (3d Cir. 2015) (citing *Staub v. Proctor Hospital*, 562 U.S. 411, 422 (2011)); *McKenna v. City of Philadelphia*, 649 F.3d 171, 178 (3d Cir. 2011).  To stave off

---

[3]    To the extent comparator evidence is relevant to the Court's analysis, there is no record evidence that a similarly situated white or female employee was accused of sexual harassment and not required to report to the reassignment room.  (Hr'g Tr. 12:22–25; 25:21–26:7.)

summary judgment under a cat's paw theory, Williams must establish (1) a genuine issue of material fact concerning the bias of the subordinate and (2) a genuine issue of material fact as to whether there is a causal relationship between the subordinate's actions and the employment decision. *See Afrasiabipour v. Penn. Dept. Trans.*, 469 F. Supp. 3d 372, 386–87 (E.D. Pa. 2020). The subordinate employee must be motivated by discriminatory animus. *McKenna v. City of Philadelphia*, 649 F.3d 171, 179 (3d Cir. 2011). To meet the proximate cause requirement, there must be "some direct relation between the injury asserted and the injurious conduct alleged" and this excludes links that are "remote, purely contingent, or indirect." *Jones*, 796 F.3d at 330 (3d Cir. 2015).

On this record, Williams cannot show Barbo was motivated by discriminatory animus when she filed her complaint against him. Williams propounds a unique theory: the fact that Barbo accused Williams of referring to **her** race and gender when he allegedly called her "thick for a white girl," and particularly that Williams denies doing so, shows that Barbo's allegation was based on **Williams's** race and gender. (Hr'g Tr. 27:10–17.) In other words, falsely accusing someone of making a racial or gender-tinged comment supports the inference that the allegation itself is motivated by racial or gender animus. (*Id.* at 32:1–5.) *See also* (*id.* at 19:12–20, 28:6–18, 29:13–21, 32:22–23 and 36:8–24). That is obviously not the law.

Williams argues that the District is not entitled to summary judgment merely because he denies Barbo's allegations and "any and all doubts must be resolved in the plaintiff's favor." (Resp. Opp. 8.) Williams is mistaken. While the Court must resolve any reasonable doubts in favor of the plaintiff at summary judgment, it need not credit "[u]nsupported assertions, conclusory allegations, or mere suspicions." *Betts*, 621 F.3d

at 252 (3d Cir. 2010).  Williams's contention that Barbo acted out of animus is unsupported and conclusory; the mere nature of the remarks Barbo reported and Williams denies cannot be enough to establish Barbo's own animus.  Although his denial may constitute an issue of material fact as to whether her complaint was fabricated, there is no evidence on the record to support it was fabricated *because of* Williams's race or gender.

An appropriate Order follows.

BY THE COURT:

**/s/ Gerald J. Pappert**

GERALD J. PAPPERT, J.

12